Filed 10/22/20  In re A.T. CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re A.T., A Person Coming Under Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | B302801 (Los Angeles County Super. Ct. No. 19CCJP06185A) |
| Plaintiff and Respondent, | |
| v. | |
| K.T. and R.M., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Sabina A. Helton, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant K.T.

Linda S. Votaw, under appointment by the Court of Appeal, for Defendant and Appellant R.M.

Office of the County Counsel, Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Appellants K.T. (father) and R.M. (mother) are the parents of a son, A.T. (born December 2015). In the proceedings below, initiated by respondent Los Angeles County Department of Children and Family Services (DCFS), the juvenile court found that father had engaged in a pattern of domestic violence against mother  It therefore found jurisdiction over A.T., removed the boy from father's custody, placed him with mother, and granted father monitored visits for a minimum of three hours per week. On appeal, father contends substantial evidence does not support the court's finding that A.T. was in substantial danger, or that there were no alternate means of protecting him short of removal.[1] Father argues in the alternative that the court abused its discretion in limiting him to three hours of monitored visits. We affirm.

---

[1] While mother also appealed, she makes no affirmative arguments, instead joining father's arguments pursuant to California Rules of Court, rule 8.200, subdivision (a)(5).

2

# STATEMENT OF RELEVANT FACTS

## A. *DCFS Investigates a Report of Domestic Violence*

In the morning of July 18, 2019, the police visited father's apartment in response to a report of domestic violence. Mother and three-year-old A.T. were present, but father was not. Mother told the police she and father had been dating for 10 years, and were A.T.'s parents. In the past four years, she and father had been involved in approximately four or five unreported domestic violence incidents, and the incident about which she had called the police had occurred around 10:00 p.m. the night before. Mother and A.T. were sitting on the bed in A.T.'s bedroom watching television, when father came in and began yelling at mother about a towel she had left on the bathroom floor. Scared, mother apologized and promised it would not happen again. Father continued yelling, then lunged at mother, grabbed her neck with both hands, and applied "tight pressure" for 10 to 15 seconds, making it difficult to breathe, while calling her a "bitch" and a "cunt." Father then released her and slapped her in the face, leaving a red mark on her cheek. Father ripped the television cord out of the wall, grabbed A.T. and locked both himself and the child in his bedroom. Mother followed and began to pound and kick on the bedroom door; she could hear A.T. crying. In response to mother's efforts, father yelled, "'I have guns! Don't try

me!'"[2]  Father eventually opened the door, and mother and A.T. returned to the boy's bedroom where they spent the night.  When they awoke the next morning, father was gone. The officer noticed redness on both mother's right cheek and the front of her neck.  Mother signed a "strangulation form" and stated she wanted father prosecuted.  The incident was referred to DCFS.

Two weeks later, on July 31, a Children's Social Worker (CSW) spoke with mother at her mother's house, where she and A.T. were staying.  Mother now downplayed father's aggression and violence: while stating father was emotionally abusive and "bullied" her, she claimed he did not strangle her, but grabbed her by the neck "'only for a few seconds'" to get her attention.  Contrary to her statement that there had been four or five unreported incidents of domestic violence, mother now told the CSW this was the first such incident with father.  The CSW also had a short conversation with A.T., in which the child shook his head when asked if he had been hit or spanked, denied seeing his parents hit each other, stated he missed father "'sometimes'" and said he did not like father's house because father "kicks him."  The CSW saw no marks or bruises on A.T.

Later that day, the CSW called father and tried to schedule a date to meet to "discuss allegations of emotional abuse" of A.T.; father, seemingly agitated, "stated loudly he

---

[2]      The police determined there were two firearms registered to father.

4

did not know what [the] CSW . . . was talking about." When informed of the police report alleging domestic violence, father "aggressively stated" there was no domestic violence, and the allegations were false. The CSW advised father she was not accusing him of anything, but needed to get his side of the story; father stated that speaking with the CSW would "stop him from making money." When the CSW told father it was important that they speak, father hung up. In a future conversation, father promised to call the CSW to schedule a time to meet, but failed to do so.

Over the next two weeks, the CSW tried repeatedly to meet with father, but he refused to confirm a date and time. On August 28, after ignoring or deferring repeated requests from the CSW, father texted her that he had an attorney and would send the CSW the attorney's information. He failed to do so.

The CSW contacted mother to ask about discrepancies between what she had told the CSW and what the police report stated she had told the police. Mother now claimed the police had "exaggerated and over dramatized the situation." In an in-person meeting, mother informed the CSW that while she was not getting back together with father and was "looking to file for a custody order," she was fearful that such an action would "start a war" with him. She was afraid he would start threatening her, and accuse her of keeping A.T. away from him. She also mentioned that she and her mother had taken A.T. to spend a night with father, and A.T. told the CSW he had fun during the visit.

However, as the CSW was preparing to leave and told A.T. that she too would be visiting father, A.T. responded, "'[W]hy?  Daddy is mean.'"

**B.**    ***DCFS Detains A.T. from Father and Files a Petition***

On September 13, the court approved an order removing A.T. from father, and on September 19, DCFS placed A.T. with mother.  When informed the court had ordered A.T. removed from father, mother asked if there was anything she could do "for father not to look like he is the 'villain.'"  She stated she did not want it to appear she was keeping A.T. away from father.  Mother was concerned father would be upset with her, and told the CSW that father blamed her for his inability to see A.T.

On September 23, DCFS filed a petition, alleging two counts under Welfare and Institutions Code section 300, subdivision (a) (Section 300(a)) and two counts under Welfare and Institutions Code section 300, subdivision (b)(1) (Section 300(b)(1)).  Counts a-1 and b-1 identically alleged that: "[A.T.]'s mother . . . and father . . . have a history of engaging in verbal and physical altercation[s].  On 7/17/19 the father used both of the father's hands to grab the mother's neck and applied tight pressure for approximately 10 to 15 seconds causing the mother to have difficulties breathing.  The father struck the mother on the right side of the mother's face.  The mother sustained redness on the mother's right cheeks and neck.  The father ripped the

6

television cord out of the wall, grabbed the child [A.T.] and went into the next bedroom and locked the door. The mother was concerned for the child's safety as she heard the child crying inside the bedroom with the father. The father threatened the mother stating 'I have guns! Don't try me!' The mother failed to protect the child by allowing the father to have unlimited access to the child. Such violent conduct on the part of the father to the mother and the mother's failure to protect endangers the child's physical health and safety, placing the child at risk of suffering serious physical harm, damage, danger and failure to protect." Counts a-2 and b-2 identically alleged that father physically abused A.T., and that on a prior occasion, father kicked A.T.'s upper body.

On September 24, the court found prima facie evidence to detain A.T. from father, released the child to mother on condition she reside with her mother, and ordered mother and father to stay away from each other. The court further ordered DCFS to work with father to develop a written visitation schedule.

### C. *DCFS Continues to Investigate; Father Is Uncooperative*

On October 25, a dependency investigator (DI) interviewed A.T. and mother. A.T. denied seeing his parents argue or engage in conflict but imitated punching and kicking and stated that father "does karate." Mother contended the allegation of domestic violence was false and

"'maximized by law enforcement.'" She emphasized this was a one-time incident, and said father's behavior was "'out of character,'" but admitted he had been aggressive and called her a "bitch" because his towel was on the floor. She now claimed father had put his hands on her chest near her neck and pushed her back, but denied he had choked her.

On October 4, DCFS sent father a contact letter via certified mail requesting he contact the DI to schedule an appointment. The letter was returned. On October 25, the DI sent father a text message asking him to contact her to schedule an appointment. They eventually met on November 5. Father refused to provide any statement about the allegations, stating that everything was fabricated, and that he was "pleading the [Fif]th on everything on the grounds of incrimination and everything that follows." He also refused to provide any social history, claiming such information had nothing to do with A.T. He claimed that mother was "'always going to be my woman.'" When the DI asked father if he wished to set up a visitation schedule with A.T., he refused, stating he would wait to see the results of the November hearing. When a CSW also offered to set up a visitation schedule, father refused to visit with A.T. at the DCFS office. The CSW provided father with referrals and encouraged him to enroll in services.

### D. *The Court Removes A.T. from Father*

On November 26, the court held the adjudication and disposition hearings. Mother and father both testified.

Mother denied telling the police father had choked or hit her. Father denied hitting or abusing mother or A.T. Both mother and father testified they were no longer in a relationship.

In closing arguments, A.T.'s counsel asked the court to sustain counts a-1 and b-1 (alleging that A.T. was in danger due to his parents' domestic violence) and dismiss counts a-2 and b-2 (alleging that father had physically abused A.T.). Father's counsel asked the court to dismiss the petition in its entirety because mother had consistently stated the police report was exaggerated; because even if the July 18 incident had occurred as described in the report, it was a one-time incident; and because there was no further risk to A.T. as the parents were no longer in a relationship. Mother's counsel also asked the court to dismiss the petition, pointing out both that mother had repeatedly told DCFS the police reports were exaggerated, and that mother had been able to protect A.T. Counsel for DCFS asked the court to sustain the petition on all counts, arguing mother's initial statements to the police were the most credible.

The court noted that the police report was "the document that [was] taken most close [in time] to the event" and therein mother "reported there were four to five previous unreported domestic violence incidents, which doesn't support that this is a one-time event." The court stated that to credit mother's and father's contrary testimony, "I would have to completely disregard what is in this police report, and I can't think of a motive of why the

9

police would try to make up something like this in such detail." The court sustained the petition as to counts a-1 and b-1, but dismissed counts a-2 and b-2, finding DCFS had not met its burden to show by a preponderance of the evidence that father had physically abused A.T.

The court then heard arguments regarding disposition. Counsel for mother argued she had plenty of familial support and asked the court not to order family preservation services; counsel also asked that mother be permitted to address domestic violence issues through the individual therapy she was already receiving. Counsel for father asked the court to return A.T. to him, or at least grant him unmonitored visits, incorporating the arguments made on jurisdiction, reminding the court the standard was now "clear and convincing eviden[ce]," and arguing that there was no evidence A.T. was at risk. Father's counsel also objected to the case plan, "as he still stands here today and says he did not commit any of these allegations." A.T.'s counsel urged the court not to release A.T. to father or to permit unmonitored visits, but suggested that father be permitted to have monitored visits at the DCFS office. DCFS's counsel argued that both mother and father should attend counseling specific to domestic violence.

The court removed A.T. from father, finding "by clear and convincing evidence that there is a substantial risk of detriment to the child's physical health, safety, protection, and/or physical and emotional well-being," and that there were no reasonable means to protect A.T. short of removal.

The court released A.T. to mother and granted father monitored visits for a minimum of three hours per week, noting that the visits would be "monitored right now," but that there would be "discretion to liberalize those visits" before the next court hearing. The court maintained its mutual "stay-away" order and ordered both parents to take classes and enroll in counseling. Both parents timely appealed.

## DISCUSSION

### A. *Substantial Evidence Supports the Dispositional Order[3]*

"Before the court may order a child physically removed from his or her parents, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 145-146.) When removal orders are appealed, "the substantial evidence test remains the

---

[3] Preliminarily, DCFS argues that mother has forfeited any challenge to the disposition order because she failed to raise an objection in the juvenile court. DCFS acknowledges, however, that "mother almost exclusively joins in father's arguments on appeal without making any independent arguments of her own, and this Court will nonetheless review the dispositional findings and orders based on father's appeal." Because father's right to challenge the disposition order is undisputed, we need not decide whether mother has forfeited her right to appeal that order.

11

appropriate standard of review, 'bearing in mind the heightened burden of proof.'" (*Id.* at 146.) "Also, we do not pass on the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence. Instead, we review the record in the light most favorable to the juvenile court's order to decide whether substantial evidence supports the order." (*Id.* at 146-147.)

Father argues the court erred in removing A.T. from his custody because there was no evidence A.T. would be at substantial risk in his custody, and because there were reasonable means to protect A.T. short of removal.[4] We address each argument in turn.

---

[4] Father also claims the "court did not state the basis for its decision to remove [A.T.] from father's custody" in violation of Welfare and Institutions Code section 361, subdivision (e). Though it is unclear what significance he attributes to this alleged error, we note that immediately after finding that father's visits with A.T. should be monitored, the court expressly stated it had reviewed the evidence and found "by clear and convincing evidence that there is a substantial risk of detriment to the child's physical health, safety, protection, and/or physical and emotional well-being." As discussed below, substantial evidence supports this finding. In any case, by failing to object below, father forfeited any challenge to the court's failure to state the specific facts supporting its findings. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected"].)

### 1. *Substantial Evidence Supports the Finding of a Substantial Risk to A.T.*

While father argues A.T. was not at risk because there was no evidence father ever harmed the child, it is well established that ongoing domestic violence occurring in the presence of a minor constitutes substantial evidence supporting a finding that returning the child to the parents would pose a substantial risk to the minor. (See, e.g., *In re F.S.* (2016) 243 Cal.App.4th 799, 812 [when four incidents of domestic violence occurred in presence of minor, "the juvenile court assuredly had before it sufficient evidence to establish Mother was unable to provide proper care for [minor] and [minor] would potentially suffer detriment if she remained in Mother's custody"]; *In re T.V.* (2013) 217 Cal.App.4th 126, 136 [when "the court removed [minor] from [father]'s custody because the evidence showed the parents engaged in a pattern of domestic violence, some of which [minor] heard or saw . . . [¶] . . . [a]lthough [minor] had not been physically injured and was otherwise healthy, the court could reasonably find she was at substantial risk of harm as a result of the parents' ongoing domestic violence and there were no reasonable means by which she could be protected without removal"].) Here, the court noted the police report stated mother had "reported there were four to five previous unreported domestic violence incidents" and the court found the police report credible. This pattern of domestic violence constitutes substantial evidence supporting the court's finding of substantial risk. Moreover, while the court found

DCFS had failed to meet its burden to show father had physically abused A.T., "the minor need not have been harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)

Father cites *In re Basilio T.* (1992) 4 Cal.App.4th 155 for the proposition that two incidents of domestic violence would be insufficient to justify removal of a child from a parent's custody.  We are unpersuaded.  In *Basilio T.*, the only evidence of danger was "two incidents of domestic violence in which the police were called . . . [which] presumably occurred in or near the minors' presence . . . ." (*Id.* at 171.)  The instant case involved not just two isolated incidents of domestic violence, but four or five previous unreported incidents over the span of four years.  Further, not only did some of the mutual abuse "presumably occur[] in or near" A.T.'s presence, in the latest incident, father grabbed A.T. after choking and slapping mother and locked himself and A.T. in his bedroom.  While locked in his room with the crying child, father yelled, "'I have guns!  Don't try me!'"  *Basilio T.* is inapposite.

>     **2.    *Substantial Evidence Supports the Finding That There Were No Reasonable Means to Protect A.T. Short of Removal***

Father argues A.T. would have been sufficiently protected if, in addition to maintaining the parties' mutual

14

"stay-away" order, the court had also ordered father to participate in the services prescribed in his case plan, and provided for unannounced home visits by DCFS. We disagree.

While both mother and father testified they were no longer in a relationship, father had previously told DCFS that mother was "always going to be my woman." The court was entitled to consider this statement when deciding whether a mutual "stay-away" order would actually keep father away.

Additionally, there is ample evidence of father's refusal to participate in services or cooperate with DCFS. During DCFS's initial investigation, father was uncooperative toward DCFS personnel, refusing to meet with them to discuss the allegations at any point during a four-week period. Even after the court detained A.T., father refused a certified letter from DCFS. When he finally met with DCFS, he refused to discuss the allegations, "pleading the [Fif]th." Additionally, while the court found no evidence that father ever struck A.T., father locked himself and the child in a room when A.T. was crying, and told mother not to "try [him]" because he had guns. Mother also expressed fear that if she filed for custody of A.T., this would "start a war" with father, and A.T. himself volunteered that father was "mean." Additionally, in objecting to the recommended case plan, father insisted he "did not commit any of these allegations." "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) On this

record, we conclude substantial evidence supports the court's determination that no means short of removal from father were available to protect A.T. Ordering father to stay away from mother, coupled with orders to attend classes and permit unannounced DCFS visits, would have been insufficient to protect A.T., in light of father's expressed belief that mother "was always going to be [his] woman," his denial of any incidents of domestic violence, and his history of refusing to cooperate with DCFS's efforts to ensure A.T.'s welfare.

**B.** *The Court Did Not Abuse Its Discretion in Ordering Monitored Visits for a Minimum of Three Hours Per Week*

While Welfare and Institutions Code section 362.1, subdivision (a)(1)(A), provides that in any disposition order, "[v]isitation shall be as frequent as possible, consistent with the well-being of the child," "'[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion. [Citation.]'" (*In re Neil D.* (2007) 155 Cal.App.4th 219, 225.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32

16

Cal.App.5th 840, 851, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Father argues the court abused its discretion in permitting him only three hours of monitored visitation per week, rather than more frequent, unmonitored visits. We disagree.

In light of the incident in which father grabbed A.T. and locked them both in a room while threatening mother with the statement "I have guns!  Don't try me!" it was reasonable for the court to insist that father's initial visits with A.T. be monitored.  This is especially so because the court specifically stated the visits were to be monitored "right now," but that there would be "discretion to liberalize" them before the next court hearing.

Additionally, while father complains that visiting A.T. for only three hours a week would be insufficient to "maintain the parental relationship," we note he made no effort to see A.T. in the two-and-a-half months leading up to the adjudication and disposition hearings.  Indeed, despite having been separated from A.T. since at least September 19, when asked in November if he wished to set up a visitation schedule, he explicitly refused, stating he would not visit A.T. in DCFS's offices.  Given father's previous refusal to visit A.T., we fail to see how the juvenile court exceeded the bounds of reason in ordering visitation to start with a minimum -- not maximum -- of three hours per week, with discretion to liberalize.

17

## DISPOSITION

The court's orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, P. J.

We concur:


WILLHITE, J.


COLLINS, J.